UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT CHATTANOOGA

| | | |
|---|---|---|
| JEFFREY SCOTT SMITH, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | 1:21-CV-294-KAC-CHS |
| | ) | |
| UNUM LIFE INSURANCE COMPANY OF | ) | |
| AMERICAN and UNUM GROUP; | ) | |
| | ) | |
| Defendants. | ) | |

## <u>MEMORANDUM OPINION AND ORDER</u>

This action is before the Court on Chief United States Magistrate Judge Christopher H. Steger's "Report and Recommendation" (the "Report") [Doc. 67] and Plaintiff Jeffrey Scott Smith's "Objections" [Doc. 73]. As set forth below, the Court (1) **ADOPTS** the conclusions of the Report [Doc. 67], (2) **OVERRULES** Plaintiff's Objections [Doc. 73], (3) **GRANTS** the "Motion for Judgment on the Administrative Record" [Doc. 44] filed by Defendants Unum Life Insurance Company of America and Unum Group, (4) **DENIES** Plaintiff's "Motion for Judgment on the ERISA Record" [Doc. 49], and (5) **DENIES** Plaintiff's "Motion to Determine Extent of Deference Given to Unum's Decision" [Doc. 43].

## I.    Background

Plaintiff began working for Silicon Graphics International Corporation as a senior software engineer on April 20, 2015 [*See* Doc. 19-1 at 2, 12]. Through his job, he received disability benefits via a policy issued by Defendant Unum Life Insurance Company[1] (the "Policy") [*See* Doc. 19]. Plaintiff stopped working on June 24, 2015, claiming a "primary disability" of cervical

---

[1] The Parties generally refer to Defendants collectively [*See, e.g.*, Docs. 45 at 1, 50 at 2]. The Court adopts that convention unless there is a reason to distinguish the entities.

and lumber radiculopathy and a "secondary disability" of memory loss [Doc. 19-1 at 64]. He received short-term disability benefits through September 2015 [*See* Doc. 67 at 1].

He also sought long-term disability benefits under the Policy [*See id.* at 2]. Generally, an individual must be "totally disabled" to qualify for long-term disability benefits [*See id.*]. The Policy defines "totally disabled" as "unable to perform with reasonable continuity the substantial and material acts necessary to pursue your usual occupation in the usual and customary way and unable to engage with reasonable continuity in another occupation in which you could reasonably be expected to perform satisfactorily in light of your age, education, training, experience, station in life, [and] physical and mental capacity" [Doc. 19 at 2].[2] The Policy gave Defendants "discretionary authority to make benefit determinations" [*Id.* at 38]. And the Policy gave Plaintiff the right to request an "Independent Medical Examination" [Doc. 19-1 at 294].

Plaintiff relied on memory loss to support his long-term disability claim. He submitted a December 2015 report from Dr. Robert Catanese [Doc. 19-2 at 449-52]. Based on neuropsychological evaluations, Dr. Catanese found that Plaintiff had "dramatic strengths and weaknesses" [*Id.* at 451]. Plaintiff's strengths included "a Full Scale-IQ score of 132, falling in the very superior range of ability" and "[o]utstanding and well-preserved performance" in "language skills and visual motor integration skills" [*Id.*]. But his "short term memory" was "two to three standards deviations below expectation given his Full-Scale IQ score" [*Id.*].

Due to "mild inconsistency across subtests" "coupled with the fact that [Plaintiff] was applying for disability, the issue of conscious exaggeration of symptoms needed to be explored" [*Id.* at 451]. But "additional evaluation ruled out any conscious exaggeration of symptoms" [*Id.*]. Dr. Catanese noted that the results "support[ed] [Plaintiff's] application for long-

---

[2] The Parties agree that this definition applies [*See* Docs. 45 at 4, 50 at 1; *see also* Doc. 67 at 2].

term disability, although his long-term prognosis remain[ed] unclear" [*Id.* at 452]. He concluded that Plaintiff had a "cognitive disorder, with primary amnestic difficulties" that had an "unclear specific etiology and [was] probably multifactorial" [*Id.*].

Dr. Jana Zimmerman, an "on-site physician" for Defendants, concluded that this testing did not support the disability claim [Doc. 19-3 at 238-39]. Dr. Zimmerman concluded that Plaintiff's "memory tests results" were "not valid or reliable" "[b]ecause of suboptimal effort" [*Id.* at 238]. Dr. Zimmerman found that this invalidity was the result of poor effort because Plaintiff's "mostly 'benign' personality test results did not offer an alternative psychiatric explanation or support psychiatric impairment" [*Id.*]. And "nevertheless, most results were within normal limits across domains" [*Id.*].

Defendants initially denied the claim [*See id.* at 252]. Plaintiff appealed [*See id.* at 301-04] He argued that Dr. Catanese's "objective medical evidence" showed that Plaintiff had a "cognitive disorder with primary symptoms of memory loss" [*See id.*].

Two on-site physicians employed by Defendants reviewed Plaintiff's claim on appeal in 2016. Dr. William Black was "not in general disagreement with" Dr. Catanese [*See id.* at 642]. To Dr. Black, Plaintiff did "demonstrate inconsistent cognitive abnormalities, and Dr. Catanese (or any other provider) ha[d] not determined a clear etiology" [*See id.*]. Dr. Black reviewed the "performance validity tests" embedded in Dr. Catanese's evaluation, and Dr. Black found that "[a]t best," Plaintiff's "level of effort during formal testing is variable, with some indications of normal effort and other indicators of inadequate effort" [*Id.* at 641]. Dr. Black found "no compelling evidence of consistent frankly fabricated or exaggerated test performance" [*See id.* at 641-42]. And although the test results were "internally inconsistent," they "reflect[ed] areas of cognitive impairment, and the neuropsychological evaluation and the treating neurologist ha[d] not

determined an etiology for the cognitive results" [*See id.* at 643]. Dr. Black recommended that Defendants reconsider the denial of Plaintiff's claim and then revisit the claim in six (6) to eight (8) months with updated information [*See id.*].

Dr. Peter Brown agreed with these findings [*See id.* at 648-50]. Dr. Brown concluded that Plaintiff's memory loss was not pre-existing, and that "there [wa]s evidence of significant cognitive impairment as of 06/30/15 for which a clear diagnosis ha[d] not been established" or for which any "[s]ignficiant contributory factors" had been "adequately addressed" [*Id.* at 650].

In August 2016, Defendants awarded Plaintiff benefits "based solely on his cognitive symptoms" [*Id.* at 653, 656]. Defendants informed Plaintiff that they might "need periodic updates of his medial status to determine if he remains eligible" [*Id.*]. Internally, Defendants noted Dr. Black's recommendation to revisit the claim in six (6) to eight (8) months [*See id.* at 653].

In January 2017, Dr. Catanese issued another report following further neuropsychological evaluations [*See* Doc. 19-4 at 477-80]. The 2017 Report showed that Plaintiff remained "in the very superior range of intellectual function [*Id.* at 479]. He showed "no incremental <u>decline</u> in any cognitive domain" and "significant improvement in short term memory skills (although not all the way back to premorbid levels of functioning)" [*Id.*]. Dr. Catanese concluded that the Plaintiff's two (2) evaluations "would suggest an individual with deficits related to vascular lesions," although "his MRI scan does not provide clinical correlation" [*Id.*]. Given this, "[s]ome uncertainty about the underlying diagnosis remain[ed]" [*Id.*].

After receiving Dr. Catanese's 2017 Report, Defendants conducted a forum discussion on April 4, 2017 [*See* Doc. 19-4 at 512-14]. The forum discussion included a "clinical" and "vocational" representative, but none of the individuals in the discussion were physicians [*See id.* at 512]. Those at the forum discussion considered Dr. Catanese's 2017 Report and the earlier

4

reviews of Defendants' on-site physicians and concluded that Plaintiff had "not returned to baseline" and that "medical improvement [was] not expected" [*See id.* at 513]. But they noted the need for a future consultation with a physician [*See id.*]. In the meantime, Defendants continued to provide Plaintiff benefits [*See id.* at 538].

In January 2019, Dr. Catanese issued another report following a third series of neuropsychological evaluations [Doc. 19-5 at 102-04]. Dr. Catanese reported: "[u]nfortunately, the results of this repeat neuropsychological evaluation must be considered unreliable and invalid due to the widely discrepant results within the same cognitive domain that cannot be explained based on neurological factors alone" [*Id.* at 103]. Plaintiff performed "just better than chance levels on some of the easiest forced choice memory tasks" while performing "well within normal limits on other memory tasks that are much harder" [*Id.*]. To Dr. Catanese, this "gross inconsistency" could not "be explained based on neurological factors alone" [*Id.* at 104]. Rather, the evaluation implicated "diminished motivation and effort, fatigue associated with sleep apnea, or even emotional interference," but "given the unreliability of the test results, the reason for this decline cannot be determined" [*Id.*]. These results contrasted with Plaintiff's previous tests, which had indicated "a consistent degree of weakness noted across multiple memory tasks" [*Id.* at 104]. Despite this dissonance, Dr. Catanese's "diagnostic impression" remained "Cognitive disorder, by clinical history" [*Id.*].

Later in 2019, Dr. Black reviewed Plaintiff's medical records and reached a different result. Dr. Black reviewed the medical records three (3) separate times [*See* Doc. 19-5 at 175-78, 186-189, 307-09]. And this time, he reviewed the underlying data for Dr. Catanese's 2017 and 2019 Reports [*See id.* at 307-09]. Dr. Black ultimately concluded that Plaintiff's medical condition did not support the cognitive limitations claimed [*See id.*].

5

In support of that conclusion, Dr. Black said that the 2015 Report was "not a fully valid and accurate representation of [Plaintiff's] cognitive function but could, in part, be interpreted" [Doc. 19-5 at 187]. Dr. Black's 2016 conclusion that "cognitive" [restrictions and limitations] of unclear etiology [were] currently supported" was based on "a brain MRI that was suggestive of mild midbrain atrophy" and "personality evidence" that "should be revisited" [*Id.* at 187-88]. The 2017 Report "reflected normal cognitive functioning" and did not support "an impairing cognitive disorder" [*See id.* at 308]. And the 2019 Report did "not provide valid evidence of a cognitive condition that could reasonably be considered functionally impairing" [*Id.*].

Unlike Dr. Catanese, Dr. Black rejected explanations other than Plaintiff's effort as bases for the invalid evaluations in the 2019 Report [*See* Doc. 19-5 at 177, 188, 308]. Dr. Black rejected the suggestion that Plaintiff's performance was the result of fatigue because "[t]here [wa]s not indication of fatigue in the written report," and he rejected the suggestion that it was the result of emotional interference because the 2019 Report did "not include an assessment of personality/emotional status" [*See id.* at 177, 308]. Rather, Plaintiff's "performance at or near random chance levels" "is recognized as a pathognomic sign of intentional poor effort and an attempt to appear impaired" [*Id.* at 177].

Dr. Stewart Russell then reviewed Plaintiff's claim twice [*See* Doc. 19-5 at 370-76, 432-35]. Dr. Russell concluded that "the totality of the medical evidence" showed that Plaintiff could perform "full-time sedentary physical demand occupations" [*See id.* at 375]. And after receiving additional information from Plaintiff's physician, Dr. Russell again concluded that Plaintiff did not suffer from "a condition which would preclude" him "from the performance of full-time sedentary physical demand occupations" [*See id.* at 434].

After seeking additional information from Plaintiff, Defendants terminated Plaintiff's disability benefits on April 23, 2020 [*See* Doc. 19-5 at 194-98, 451-62]. Defendants explained the physical demands of Plaintiff's occupation, the efforts Defendants made to obtain his medical information, and why they believed the medical evidence did not support his claim [*See id.* at 452-58]. Ultimately, Defendants "determined that [Plaintiff] would have the functional capacity to perform the duties of his own occupation performed within the sedentary physical demand level on a full-time basis" [*See id.* at 458].

In September 2020, Plaintiff appealed this denial [*See* Doc. 19-5 at 511-12]. In support, he submitted an "Independent Neuropsychological Evaluation" conducted by Dr. Pamela Auble [*See id.* at 542-63]. Again, Plaintiff's "intelligence fell within the superior range" [*Id.* at 557]. But his processing speed and verbal memory were "in the average range" and "lower than expected given his intelligence," and he was "average to mildly impaired on a test of sustained attention" [*See id.* at 560]. Dr. Auble's findings aligned with Plaintiff's 2017 results [*See id.* at 561, 903]. And she was "confident that the [2020] results [were] valid" [*Id.* at 560]. She diagnosed Plaintiff with a "mild neuropsychological impairment in the areas of auditory memory and processing speed" [*Id.* at 561]. This would not limit his functioning for daily activities, but it "would be most apparent in the high level, demanding jobs which he held in the past" [*See id.* at 562]. So, in Dr. Auble's view, Plaintiff's reentry into the workforce "would be challenging and perhaps not possible given his high level jobs and [his] neuropsychological impairments" [*Id.* at 563]. But Dr. Auble's report did not specifically address any responsibilities of Plaintiff's prior jobs or how his "mild neuropsychological impairment" mapped onto those responsibilities [*See id.* at 542-63].

Multiple medical professionals reviewed Plaintiff records on appeal. Dr. Julie Guay, an outside medical consultant, found that Dr. Auble's test was valid [*See id.* at 665]. But Dr. Guay

7

concluded that Plaintiff's "mild relative weakness" did "not provide evidence of any significant cognitive deficits" [*See id.* at 666]. After his own review, Dr. Russell concluded that Plaintiff was "not impaired from performing his own occupation based on a mild neurocognitive disorder with relative weaknesses on testing that are not functionally significant" [*Id.* at 831]. Norma Parras-Potenzo, a "Vocational Rehabilitation Consultant" with Defendants, specifically reviewed "the demands of the insured's occupation" [*See id.* at 842]. She found that Plaintiff "can perform the duties of his occupation with the 'relative weakness' in auditory memory and processing speed" demonstrated [*Id.*]. Dr. Brown agreed, explaining that "although underlying psychiatric and general medical conditions may be interfering with optimal cognitive function, they would not preclude sustaining full time functional capacity" [*See id.* at 917-19].

Defendants denied Plaintiff's appeal [*See id.* at 922-30]. Defendants "concluded Plaintiff was capable of performing the substantial and material acts necessary to pursue his usual occupation in the usual and customary way" [*Id.* at 923]. Defendants noted that Dr. Auble's assessment of Plaintiff's "relative weakness" in "auditory memory" "did not reflect a significant cognitive deficit" [*Id.* at 926]. Defendants listed the demands of Plaintiff's occupation and explained why Plaintiff's limitations did not prevent him from working [*See id.* at 923, 927-28].

Unsatisfied, Plaintiff filed a Complaint under the Employment Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1001 et seq., alleging that Defendants termination of long-term disability benefits was "arbitrary and capricious" [*See* Doc. 1 at 4]. Each Party moved for judgment on the ERISA record, [*see* Docs. 44, 49], a procedural oddity, *see Goodwin v. Unum Life Ins. Co. of Am.*, 137 F.4th 582, 588 n.1 (6th Cir. 2025).

8

Plaintiff also filed a "Motion to Determine Extent of Deference Given to Unum's Decision" [Doc. 43]. That Motion generally argued that Defendants' financial interests tainted their decision to deny his claim. [*See id.* at 5, 18-22].

Some background is necessary. Defendants operate as both plan administrator and insurer—they decide whether benefits are due under the Policy and if so, pay the benefits [*See* Doc. 67 at 24]. To do this, Defendants rely on "directors," who oversee teams of "benefits specialists," who in turn manage individual claims [*See* Doc. 57-2 at 5 (Michelle Allen Dep. ("Allen Dep.") at 13:3-21)]. Director Michelle Allen oversaw the team of benefits specialists who managed Plaintiff's claim. Defendants gave Director Allen a "consolidated operational summary" that compared her actual claim "recoveries" against "guidance" recoveries and her "momentum" towards meeting the monthly guidance recoveries [*See* Docs. 48-5, 46-13 at 57 (Allen Dep. at 57:2-20)]. She met her recovery "guidance" each month between May 2019 and April 2020, except one [*See* Doc. 46-13 at 17-18 (Allen Dep. 65:21-64:21)]. Defendants also generally provide certain employees, including the physicians it employs, bonuses based on their performance and the Company's success [*See* Doc. 47-17 at 16 (Freeman Broadwell Dep. 133:2-138:15)]. In 2004, Defendant Unum Life Insurance Company of America entered into a regulatory settlement agreement [*See* Doc. 46-1]. And in 2002 and 2008, it was found liable for punitive damages related to its claims handling [*See* Doc. 46 at 7 (citing *Merrick v. Paul Revere Life Ins. Co.*, 594 F. Supp. 2d 1168 (D. Nev. 2008); *Hangarter v. Paul Revere Life Ins. Co.*, 236 F. Supp. 2d 1069 (N.D. Cal. 2002) *aff'd in part, rev'd in part* 373 F.3d 998 (9th Cir. 2004))].

The Court referred both Motions [Doc. 52]. And Chief Judge Steger issued the Report [Doc. 67]. The Report recommends that the Court deny Plaintiff's Motion to Determine Extent of Deference [Doc. 43], but the Report still considers Defendants' financial interests in

9

assessing whether Defendants' denial was supported [*See* Doc. 67 at 15-16]. The Report ultimately recommends that the Court grant Defendants' Motion for Judgment on the ERISA Record and deny Plaintiff's [*Id.* at 25].

Plaintiff raises three (3) objections to the Report. ***First***, he argues that Defendants did not have a reasonable basis for denying his long-term disability benefits claim because it "relied on inconsistent file reviewing physicians" and, in any event, "the weight of the evidence shows" that he "is disabled due to cognitive deficits" [*See* Doc. 73 at 4-11]. ***Second***, he argues that the Report erred "[i]n finding Unum's reliance on file review credibility determinations appropriate" and "granting no weight to Unum's failure to physically examine" Plaintiff [*See id.* at 11-14]. ***Third***, Plaintiff argues that the Report erred by discounting Defendants' bias [*See id.* at 14-19].

## II.      Analysis

The Court reviews Plaintiff's objections de novo. *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b). In doing so, the Court gives "fresh consideration to those issues to which specific objection has been made." *See United States v. Raddatz*, 447 U.S. 667, 675 (1980).

A participant in a qualifying insurance plan may bring a civil action under ERISA "to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plain, or to clarify his rights to future benefits under the terms of the plan." 29 U.S.C. § 1132(a)(1). The Court's review depends on the deference the relevant policy provides the administrator. *See Autran v. Procter & Gamble Health and Long-Term Disability Benefits Plan*, 27 F.4th 405, 411 (6th Cir. 2022). Here, because the Policy gave Defendants "discretionary authority to make benefit determinations," [Doc. 19 at 38], the Court's reviews Defendants' denial for an abuse of

10

discretion, *see Goodwin*, 137 F.4th at 588-89.[3]  The "touchstone[]" of this inquiry is "reasonableness."  *Id.* at 589; *see also Autran*, 27 F.4th at 412.  In assessing whether Defendants abused their discretion here, the Court limits its review to the administrative record.  *See Tranbarger v. Lincoln Life & Annuity Co. of N.Y.*, 68 F.4th 311, 314 (6th Cir. 2023).

### A. Defendants Acted Within Their Discretion In Terminating Benefits In 2020.

Taking the ultimate question first, Defendants did not abuse their discretion in terminating Plaintiff's long-term disability benefits in 2020.  Plaintiff specifically argues that Defendants (1) acted unreasonably in relying on the "invalid" 2019 neuropsychological evaluation to terminate benefits and (2) did not adequately account for Dr. Auble's neuropsychological evaluation [Doc. 73 at 5-11].  Both arguments fail.

An "administrator must 'identify a "rational" reason' for changing its benefits answers from 'yes' to 'no.'"  *Goodwin*, 137 F.4th at 590 (quoting *Autran*, 27 F.4th at 414).  "This 'rational reason' requirement sets forth a 'low bar.'"  *Id.*  Defendants cleared that "low bar."

New evidence in Dr. Catanese's 2019 Report justified Defendants' changed position [*See* Doc. 19-5 at 176-77, 307-08].  Dr. Black agreed with Dr. Catanese that the 2019 evaluation was "invalid" [*See id.* at 177].  But Dr. Black also explained why the invalidity was the result of poor effort—"sign[s] of intentional poor effort and an attempt to appear impaired" were present with no evidence of fatigue or emotional interference [*See id.* at 177-78].  The invalid 2019 test also reinforced Dr. Black's earlier concerns about the validity of Dr. Catanese's 2015

---

[3] The Parties rely on an arbitrary and capricious standard [*See, e.g.*, Docs. 73, 75].  The Sixth Circuit decided *Goodwin* while the motions were pending.  It clarified that for a case in this posture, the Court "filter[s] our deferential review through an abuse of discretion standard, not arbitrariness review."  *See Goodwin*, 137 F.4th at 588.  No Party submitted a supplemental brief. Fortunately, both past and present phraseology "is faithful to Supreme Court precedent" because it "zero[es] in on reasonableness."  *See id.* at 589.

11

Case 1:21-cv-00294-KAC-CHS   Document 77   Filed 07/06/26   Page 11 of 16
PageID #: 10199

evaluation [*See id.* at 308]. Remember that the 2015 evaluation was the basis for awarding Plaintiff benefits originally [*See* Doc. 19-3 at 653]. Dr. Black expressed some misgivings regarding whether Plaintiff was giving appropriate effort during the 2015 evaluation, but Dr. Black recommended benefits because he found "no compelling evidence of consistent frankly fabricated or exaggerated test performance" [*See id.* at 641-42]. He recommended benefits initially because the cause of the claimed disability was unclear, and he recommended that the claim be reevaluated in six (6) to eight (8) months [*See id.* at 641-43]. Four (4) years later, the cause of Plaintiff's condition was still uncertain, and there was now a second evaluation that raised questions about Plaintiff's effort and the validity of his test results [*See* Doc. 19-5 at 187-89]. That left the unchallenged 2017 Report, which (1) showed "significant improvement in short term memory skills" and (2) "some uncertainty about the underlying diagnosis" [*See* Doc. 19-4 at 477-80]. In concert, Dr. Black adequately explained why the 2019 evaluation, even if invalid (and perhaps because it was invalid), provided a sufficient basis for rejecting the claim.

Against this, Plaintiff presents the April 2017 forum discussion in which the participants noted that Plaintiff had "not returned to baseline and medical improvement is not expected" [*See* Doc. 73 at 7 (citing Doc. 19-4 at 512-13)]. But no physicians attended that forum [*See* Doc. 19-4 at 512]. And those present only considered the evidence available to them at the time [*See id.* at 512-13]. In April 2017, Defendants did not yet have the benefit of Plaintiff's later testing and evaluation. Defendants did not abuse their discretion in making a contrary decision after the 2019 evaluation, further review of the underlying data, and the passage of time with room for improvement in Plaintiff's condition. *See Goodwin*, 137 F.4th at 590.

Moving to the second argument, Defendants adequately accounted for Dr. Auble's evaluation. Dr. Guay specifically considered Dr. Auble evaluation and findings [*See* Doc. 19-5 at

12

665].  But she concluded that Plaintiff's "relative weakness compared to some of [Plaintiff's] other abilities" "does not reflect a significant function deficit" [*Id.* at 666].  Dr. Russell considered Dr. Auble's findings too, before determining that Plaintiff's "mild relative weakness" did not prevent him "from performing his own occupation" [*See id.* at 829-32].  Dr. Brown agreed [*See id.* at 917-919].  The law required Defendants to "give reasons for adopting an alternative opinion" to the treating physician.  *See Shaw v. AT&T Umbrella Benefit Plan No.* 1, 795 F.3d 538, 548-49 (6th Cir. 2015) (citations omitted).  Defendants did so.  And "[g]enerally," the "administrator's decision cannot be said to" be unreasonable just because the administrator "chooses to rely upon the medical opinion of one doctor over that of another."  *Goodwin*, 137 F.4th at 591.  So, this argument fails.

### B.  The Report's Review And Assessment Of The Record Was Not Erroneous.

Moving to Plaintiff's more granular objections, the Report did not err "[i]n finding Unum's reliance on file review credibility determinations appropriate" or "granting no weight to Unum's failure to physically examine" Plaintiff [*See* Doc. 73 at 11, 13].  Under the law, the opinion of a treating physician is not categorically entitled to more weight than that of a non-treating physician. *See Goodwin*, 137 F.4th at 591.

Plaintiff's claimed disability was evidenced through "objective neuropsychological testing" [Doc. 19-3 at 301; *see also* Doc. 73 at 3 (referring to "consistent objective evaluations")].  Rather than making "credibility determinations," the "file review" physicians relied on the same "objective neuropsychological testing" performed by Plaintiff's treating physicians.  They just reached different conclusions from the testing.  Predominantly, Dr. Black concluded that it was poor effort that caused Plaintiff's 2019 invalid evaluation [*See* Doc. 73 at 13].  Even Plaintiff's treating physician Dr. Catanese questioned Plaintiff's effort [*See* Doc. 19-5 at 102-04].  And Dr.

13

Black adequately explained why poor effort was a better explanation for the invalid test result than other possibilities [*See id.* at 103, 177, 188]. As such, the report did not err.

Next, Defendants appropriately relied on review of Plaintiff's medical records without requiring a physical examination of Plaintiff. Legally, the law did not require Defendants to perform a physical examination of Plaintiff. *See Frazier v. Life Ins. Co. of N. Am.*, 725 F.3d 560, 570 (6th Cir. 2013). Nor does the law generally require Defendants to give special weight to the opinion of Plaintiff's treating physician. *See Goodwin*, 137 F.4th at 591. Factually, because Defendants did not ultimately dispute the validity of Dr. Auble's latest-in-time examination or that Plaintiff had a "[m]ild neurocognitive disorder," it is unclear what Plaintiff believes a physical examination would have shown to help his cause [*See* Doc. 19-5 at 559, 665-66]. And assessing the facts in the record, Dr. Auble did not analyze the demands of Plaintiff's profession or how his limitations tracked with the definition of "totally disabled" in the Policy [*See id.*]. Defendants did [*See id.* at 831-32, 841-42]. In total, Defendants acted within their discretion in relying on "file review" physicians and the record available to them. Moreover, Plaintiff was advised of his right to request an independent medical examination, [*see* Doc. 19-1 at 294], and he did not request one, [*see* Doc. 73 at 13]. Accordingly, the Report did not err.

### C. The Report Properly Considered Defendants' Bias.

Finally, the Report properly considered evidence of Defendants' bias. Defendants' "'dual role' of both deciding a plan participant's eligibility for benefits and paying out those benefits from its own coffers" creates an "inherent conflict." *Autran*, 27 F.4th at 418 (quoting *Metro. Life Ins. Co. v. Glenn*, 554 U.S. 105, 117 (2008)). But "'conclusory allegations of bias' based on this (relatively common) inherent conflict do not deserve much weight." *Id.* Rather, the conflict must "materialize[] in a concrete way to influence the administrator's decisional process." *Id.* (citing

*Frazier*, 725 F.3d at 570; *Cooper v. Life Ins. Co. of N. Am.*, 486 F.3d 157, 165 (6th Cir. 2007)). The evidence of that influence "must be 'significant,' showing 'that the conflict actually affected or motivated *the decision at issue*.'" *Harmon v. Unum Life Ins. Co. of Am.*, No. 23-5619, 2024 WL 1075068, at *4 (6th Cir. Mar. 12, 2024) (quoting *Cooper*, 486 F.3d at 165).

Here, the evidence is lacking. Plaintiff's primary evidence of concrete bias was that Director Allen "was routinely provided with and met or exceeded [ ] monthly termination goals while in charge of [Plaintiff's] claim" [*See* Doc. 73 at 15-17]. The Sixth Circuit has rejected the argument that an Unum Director receiving tracking reports shows impermissible bias. *See Harmon*, 2024 WL 1075068, at *4 (citing *Sandeen v. Unum Grp. Corp.*, No. 22-5374, 2023 WL 2379012, at *2 (6th Cir. Mar. 7, 2023)). The Court does so here too. There simply has not been a "significant showing" that the provision of monthly termination goals and Director Allen's general success at meeting those goals "actually affected or motivated" Defendants' decision to terminate Plaintiff's benefits. *See Harmon*, 2024 WL 1075068, at *4.[4]

Plaintiff also argues that Defendants' on-site physicians are biased because they can receive bonuses if the Company succeeds [Doc. 73 at 17]. This extrapolates too far. Plaintiff presented testimony that Defendants' employees may receive bonuses if the company is successful [*See* Doc. 47-17 at 16 (Freeman Broadwell Dep. 133:2-138:15)]. But there is no evidence that any such bonuses affected the views of the on-site physicians who actually reviewed Plaintiff's claim. On Plaintiff's theory, impermissible bias is shown because Defendants' "file-reviewers cherry-picked the record in order to lead [Plaintiff's] claim toward denial" [*Id.*]. But as discussed above, the physicians who reviewed Plaintiff's records thoroughly explained what they reviewed,

---

[4] Plaintiff also identified testimony from individuals who were not involved in terminating Plaintiff's claim [*See* Doc. 73 at 15-17; *see also* Doc. 47 at 8-17]. This too is not "significant" evidence of actual affect or motivation. *See Harmon*, 2024 WL 1075068, at *4.

15

their conclusions, and the bases for those conclusions. So, there was no "cherry-pick[ing]." And there was no evidence of "a concrete way" that any reviewing physician's potential bonus influenced his or her conclusions. *See Autran*, 27 F.4th at 418.

Finally, Plaintiff's argument about Defendants' "history of biased claims administration" misses the mark. Plaintiff presents evidence of a regulatory settlement from 2004 and jury verdicts from 2002 and 2008 [*See* Docs. 73 at 17-18, 46 at 7]. This "history" occurred well before Plaintiff ever submitted a claim. And there is no evidence that these prior challenges continued into the relevant time and concretely influenced Defendants' decision to terminate Plaintiff's benefits. *See Autran*, 27 F.4th at 418. As such, Defendants' structure and history weigh in Plaintiff's favor, but the Report did not err in affording them "little weight" [Doc. 67 at 25].

## III. Conclusion

For the above reasons, the Court **ADOPTS** the conclusions of the Report [Doc. 67], **OVERRULES** Plaintiff's Objections [Doc. 73], **GRANTS** Defendants' "Motion for Judgment on the Administrative Record" [Doc. 49], **DENIES** Plaintiff's "Motion for Judgment on the ERISA Record" [Doc. 49], and **DENIES** Plaintiff's "Motion to Determine Extent of Deference Given to Unum's Decision" [Doc. 43]. An appropriate judgment will enter.

SO ORDERED.

KATHERINE A. CRYTZER
United States District Judge